UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEVI STRAUSS & CO.,<br><br>　　　　　Plaintiff,<br><br>　　v.<br><br>AQUA DYNAMICS SYSTEMS, INC.,<br><br>　　　　　Defendant. | Case No. 15-cv-04718-WHO<br><br>**ORDER GRANTING MOTION TO COMPEL ARBITRATION**<br><br>Re: Dkt. No. 45 |

　　　　Defendant Aqua Dynamics Systems, Inc., moves to compel this action to arbitration. Plaintiff Levi Strauss & Co. opposes, arguing that Aqua lacks standing to enforce the arbitration agreement because Aqua is not a signatory to the underlying agreement Levi entered in 1994 with different parties. Under that agreement, Levi's consent to any assignment was required; consent was never sought nor obtained in the two transfers of the interest at issue here. Nonetheless, I find that Levi waived any breach concerning the first transfer in 1998 to a third party, Ozone, by Levi's conduct over several years in treating Ozone as the licensor. And Aqua did not need Levi's consent in 2006 when Aqua succeeded to the interest of Ozone because Aqua was the successor in interest to Ozone, not the assignee; accordingly, the prior consent requirement did not apply. Aqua is entitled to enforce the arbitration agreement and I GRANT the motion to compel.

## BACKGROUND

**I.　　FACTUAL BACKGROUND**

　　　　To resolve this motion, one must follow the complicated history of the transfers of the interests involved. In August 1991, patent-owner Eric Wasinger and Aqua Dynamics Group Corp. ("ADGC") entered into an agreement ("Wasinger Agreement") that provided ADGC with an exclusive license to the Ozone Process patents and development rights in exchange for payment of royalties to Wasinger. Declaration of Joyce Long (Dkt. No. 46) ¶ 3; *see also* Long Decl., Ex. A (Wasinger Agreement). In a 1992 amendment to the Wasinger Agreement, ADGC and Wasinger agreed that if ADGC breached the agreement and failed to timely cure, then "the license granted to

1  [ADGC] . . . shall terminate, and [ADGC] shall forfeit any further rights to utilize the process,
2  inventions and innovations, all rights to which shall revert back to Wasinger." Long Decl., Ex. D
3  (Dkt. No. 46-4) at 12.
4  In October 1994, ADGC transferred its interest in the Wasinger Agreement to Bernard
5  Blasingame. Long Decl. ¶ 3. Around the same time, Blasingame transferred the same interest to
6  Earth Aire Corporation ("EAC"). *Id.*
7  In December 1994, EAC, Eric Wasinger, and plaintiff Levi Strauss & Co. ("Levi") entered
8  a written license agreement ("License Agreement"). Long Decl., Ex. E (Dkt. No. 46-5). The
9  License Agreement granted Levi the right to use the Ozone Process. *Id.* In exchange, Levi agreed
10  to pay royalties to EAC. *Id.* The License Agreement "became effective on December 14, 1994
11  and contained a seventeen year term ending on December 14, 2011." Long Decl. ¶ 5.
12  The License Agreement includes an arbitration provision stating that:

> all disputes, differences of opinion, or controversies which may arise between the parties hereto out of or in relation to or in connection with this Agreement or the breach thereof, shall be finally settled by arbitration in Chicago, Illinois (or such other place as may be agreed upon by the parties) by a panel of three (3) arbitrators in accordance with the Rules of the American Arbitration Association, in the form pertaining at the time the arbitration is initiated.

License Agreement § 15.2. The License Agreement also includes two assignment clauses. The first provides:

> This Agreement may be assigned by LS&CO with EAC's prior written consent, which consent shall not be unreasonably withheld, if, and only if, such assignment is made to a single purchaser or to a group of purchasers of substantially all the assets used by LS&CO in the performance of this Agreement. This Agreement may be assigned by EAC with LS&CO's prior written consent, which consent shall not be unreasonably withheld. Subject to such restrictions, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns.

License Agreement § 16.2. The second assignment clause, specific to Wasinger, states:

> WASINGER may assign his rights under the Licensed Patents subject to the grants and covenants herein to LS&CO and shall advise LS&CO promptly if any such assignment has been made.

License Agreement § 16.3.

In April 1998, EAC struggled to pay royalties to Wasinger under the Wasinger Agreement.

Long Decl. ¶ 8. Consequently, Wasinger and Ozone Engineering, Design and Services Corp. ("Ozone") entered into an agreement providing that if EAC defaulted on its payments to Wasinger, Ozone would have 10 days to assume the rights under EAC's contract with Wasinger (e.g., the rights to license the patents). If Ozone exercised that right upon default by EAC, EAC's rights under the License Agreement with Levi would "revert" to Wasinger but simultaneously would be assigned by Wasinger to Ozone. Long Decl. ¶ 9; *see also* Long Decl. Ex. G (Dkt. No. 46-7). Shortly thereafter, EAC defaulted, Ozone assumed EAC's interests in the Wasinger Agreement, the License Agreement automatically reverted to Wasinger, and the License Agreement was simultaneously assigned to Ozone. Long Decl., Ex. H (Dkt. No. 46-8) at 2, Ex. I (Dkt. No. 46-9) at 2.

Correspondence from Ozone notified Levi that Ozone assumed the rights under the License Agreement. That correspondence includes a September 14, 1998 letter co-signed and sent by the former President of Ozone and President of EAC "to notify Levi of the need to assign the rights to the [License Agreement] between [Levi] and [EAC] to [Ozone]." Long Decl., Ex. J (Dkt. No. 46-10). There is no evidence that EAC or Ozone requested Levi's prior written consent for this assignment. Likewise, there is no evidence that EAC or Ozone notified Levi of the interim "reversion" of the rights in the License Agreement to Wasinger and the simultaneous assignment to Ozone.

Sometime in 1999, Aqua became the sole shareholder of Ozone. Long Decl. ¶ 14. In June 2000, Levi sent to James Stackhouse (then Vice President of Ozone and current Vice President of Aqua) two quarterly reports regarding the patent usage royalties. Long Decl., Ex. K at 8; *see also* Motion to Compel ("Mot.") (Dkt. No. 45 at 13).

Around January 16, 2001, as part of a negotiation over the alleged misuse of the Ozone patented process by an outside contractor of Levi's, Levi's attorney sent a letter to Ozone's attorney regarding potential modifications to the License Agreement. Levi's attorney stated that, as part of the discussed modification, the parties to the Agreement needed to be "corrected" and noted, "[EAC]'s assignment of the agreement was apparently made without the written consent of [Levi],

3

and accordingly constitutes a technical breach of Article 16.2 of the [License] Agreement." *Id.* at 10. The letter requested "a copy of the documentation establishing the chain of title from [EAC], to [Aqua] (or [Ozone], or whoever claims to now be the Licensor)." *Id.* There is no evidence Levi took any further steps with respect to the "technical breach" and the License Agreement was not modified.

In 2004, Levi allegedly stopped paying royalties and issuing officer's certifications corresponding to the royalties. Long Decl. ¶ 16.[1] In 2005, Levi received a letter from Fiberzone, which asserted that it was "the current owner and licensor" of the Ozone process and requested an audit of Levi's records relating to the use of ozone by Levi and its subcontractors. Declaration of Robert A. McFarlane, Exh. B (Dkt. No. 50-2) at 27. In his deposition, Blasingame identified Fiberzone Technologies Inc. as a "separate corporate entity" previously owned by his daughter, Katherine Blasingame. McFarlane Decl., Ex. A at 3-4.

In August 2006, Ozone was administratively dissolved and all of its assets, including its interest in the License Agreement, were transferred to Aqua. Long Decl. ¶ 15. There is no evidence that Levi's prior written consent to this transfer was sought or provided. An October 18, 2006 letter to Levi from Aqua asks for an accounting and other information from Levi and informs Levi that, "Because we have unpaid taxes Internal Revenue Services has attached a lien on all Ozone Engineering Design and Services' assets and instructed us to prepare a liquidation plan, so getting the payments and reports current is of extreme urgency." Long Decl., Ex. M (Dkt. No. 46-13). *Id.* The record does not reflect further communication between the parties until the litigation commenced.

## II.   PROCEDURAL BACKGROUND

On February 4, 2015, Aqua filed an action against Levi in the United States District Court for the Southern District of New York for breach of contract and patent infringement (the "New York action"). First Amended Complaint ("FAC") ¶ 11. Aqua's New York complaint alleged

---

[1] The parties' assertions and the correspondence imply that Levi paid royalties until 2004. But there is no evidence regarding how much Levi paid in royalties, to whom such payments were made, or when those payments were made until they stopped in 2004.

4

that "[i]n or around 2002," Levi stopped paying royalties, thereby breaching the Agreement. FAC, Ex. E. (New York Complaint ¶ 9). Aqua subsequently amended its complaint to drop the patent infringement cause of action. FAC, Exs. F, G (New York First Amended Complaint and Second Amended Complaint).[2]

On August 17, 2015, Aqua and Levi executed an agreement to modify the License Agreement's arbitration provision. Long Decl., Ex. F (Dkt. No. 46-6). The amendment provides:

> AMENDMENT TO ARBITRATION AGREEMENT
>
> [ . . . ]
>
> WHEREAS, Aqua alleges that it is the successor in interest to [EAC]; and
>
> WHEREAS, EAC and LS&Co. are parties to [the Agreement]; and
>
> WHEREAS, the Agreement contains certain provisions relating to Arbitration; and
>
> WHEREAS, the Parties,[3] by their attorneys, wish to vary certain terms of the Agreement relating to only the place at which arbitration may take place and the organization which shall conduct the Arbitration;
>
> THEREFORE, IT IS AGREED AS FOLLOWS:
>
> 1. This Agreement does not constitute a waiver, abandonment or modification of any claim, defense or counterclaim of either Party or to LS&Co.'s right to assert that this case is not subject to arbitration, but, to the contrary, effects only the provision of paragraph 15.2 referenced below.
>
> 2. The Parties agree that paragraph 15.2 of the Agreement shall be modified only to the extent that the place of arbitration, if any shall take place, shall be San Francisco, California, and such arbitration shall be conducted before a JAMS panel of three neutral arbitrators and pursuant to "JAMS Comprehensive Arbitration Rules & Procedures," effective July 1, 2014.
>
> 3. Except as set forth in paragraph 2 above, the Agreement remains unchanged and unmodified.

Long Decl., Ex. F (Dkt. No. 46-6).

---

[2] On February 10, 2016, Aqua voluntarily dismissed the New York action, stating that "no federal question . . . or diversity of citizenship now exists between the parties." McFarlane Decl. Ex. 1 (Dkt. No. 34-1).

[3] The amendment defines the "Parties" as Aqua and Levi. Long Decl., Ex. F.

5

On September 15, 2015, Aqua filed a "Demand for Arbitration Before JAMS" seeking to arbitrate the same breach of contract dispute at issue in the New York action. FAC, Ex. A. In response, Levi filed this action on October 13, 2015, and filed a FAC on January 1, 2016. Dkt. Nos. 1, 22. Levi's FAC contains three causes of action seeking declaratory judgment that: (1) Aqua, as a nonsignatory to the license agreement, lacks standing to enforce its arbitration provision; (2) Aqua waived its rights, if any, to enforce the arbitration provision; and (3) Levi has not breached the license agreement. FAC ¶¶ 42-64.

In February 2016, Aqua filed a motion to dismiss for lack of jurisdiction or, in the alternative, to dismiss or stay the case pending arbitration. Dkt. No. 30.[4] In April 2016, I denied Aqua's motion to dismiss for lack of subject matter jurisdiction, finding that federal question jurisdiction existed. Dkt. No. 37. I also denied Aqua's alternate request to dismiss or stay the case pending arbitration. *Id.* I concluded that Levi's waiver argument – that Aqua waived its rights to enforce the License Agreement's arbitration provision by failing to demand arbitration until approximately 13 years after the alleged breach commenced, and approximately nine years after it sent Levi a Notice of Default in 2006 – was for the arbitrators to decide. *Id.* at 13-14. However, I determined that Levi's nonsignatory standing argument – that Aqua, as a nonsignatory to the license agreement, lacks standing to enforce its arbitration provision – should be resolved by me. *Id.* at 13. The parties subsequently conducted discovery on the nonsignatory issue, and Aqua's motion to compel arbitration followed. Dkt. No. 45.

## LEGAL STANDARD

The Federal Arbitration Act ("FAA") governs motions to compel arbitration. 9 U.S.C. §§ 1 *et seq*. Under the FAA, a district court determines (1) whether a valid agreement to arbitrate exists and, if it does, (2) whether the agreement encompasses the dispute at issue. *Lifescan, Inc. v. Premier Diabetic Servs., Inc.*, 363 F.3d 1010, 1012 (9th Cir. 2004). "To evaluate the validity of an arbitration agreement, federal courts should apply ordinary state-law principles that govern the formation of contracts." *Ingle v. Circuit City Stores, Inc.*, 328 F.3d 1165, 1170 (9th Cir. 2003)

---

[4] The parties stipulated to stay the arbitration pending my resolution of Aqua's motion to dismiss or stay. Dkt. No. 32.

(internal quotations omitted).  If the court is satisfied "that the making of the arbitration agreement or the failure to comply with the agreement is not in issue, the court shall make an order directing the parties to proceed to arbitration in accordance with the terms of the agreement." 9 U.S.C. § 4.

"When evaluating a motion to compel arbitration, courts treat the facts as they would when ruling on a motion for summary judgment, construing all facts and reasonable inferences that can be drawn from those facts in a light most favorable to the non-moving party." *Switch, LLC v. ixmation, Inc.*, No. 15-CV-01637-MEJ, 2015 WL 4463672, at *3 (N.D. Cal. July 21, 2015) (internal quotation marks and citations omitted).  But any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration.  *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 721 (9th Cir. 1999).

## DISCUSSION

It is undisputed that the License Agreement contains a valid arbitration clause and that the underlying dispute at issue — the alleged failure to pay royalties under the License Agreement — falls within the scope of the arbitration clause.  The parties disagree whether Aqua, as a nonsignatory to the License Agreement, has standing to invoke the arbitration provision.  Aqua argues that it has standing because it validly assumed EAC's interest in the License Agreement.  Levi responds that the License Agreement's assignment clause requiring Levi's prior written consent to any assignment by EAC renders the transfer of rights to Aqua invalid.  I must decide two issues:  (i) whether federal or state law governs Aqua's ability to enforce the arbitration provision; and (ii) under the applicable law, whether Aqua has standing to enforce the arbitration agreement.

## I.     APPLICABLE LAW

Under both federal and California law, Aqua, as a nonsignatory, bears the burden of demonstrating that it is an assignee or otherwise a party to the arbitration agreement.  *See Britton v. Co-op Banking Grp.*, 4 F.3d 742, 746 (9th Cir. 1993) ("An assignee of a contractual right must prove the validity of his ownership claims."); *Jones v. Jacobson*, 195 Cal. App. 4th 1, 15 (2011), *as modified* (June 1, 2011) ("[W]hen a nonsignatory seeks to enforce an arbitration agreement/provision against a signatory . . . the nonsignatory bears the burden to establish he or

she is a party to the arbitration agreement/provision covering the dispute." (emphasis removed)). However, California law and a federal rule set out different standards for determining whether this burden is met, and the parties disagree on which standard should apply here.

### A. California Versus Federal Law on Patent License Assignability

Aqua argues that California law governs. Mot. at 10. Under California law, "[g]eneral contract and agency principles apply in determining the enforcement of an arbitration agreement by or against nonsignatories. Among these principles are 1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel." *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1045 (9th Cir. 2009) (internal quotation marks and citations omitted). Further, "California law evidences a policy in favor of the free transferability of all types of property," including the assignability of patent licenses. *Superbrace, Inc. v. Tidwell*, 124 Cal. App. 4th 388, 401 (2004) (internal quotation marks and citation omitted).

Levi, on the other hand, contends that a federal rule specific to the assignability of patent licenses applies. Opposition to Motion to Compel ("Oppo.") (Dkt. No. 50) at 9. Under the federal rule, "agreements granting patent licenses are personal and not assignable unless expressly made so." *PPG Industries, Inc. v. Guardian Industries Corp.*, 597 F.2d 1090, 1093 (6th Cir. 1979); *see also In re CFLC, Inc.*, 89 F.3d 673, 680 (9th Cir. 1996) (patent licenses are "personal and assignable only with the consent of the licensor"). Decisions following the federal rule have strictly construed assignability clauses. *See, e.g., PPG Industries, Inc.*, 597 F.2d at 1092, 1095 (patent license with assignability clause requiring licensor's prior written consent could not be assigned through merger without licensor's consent); *In re CFLC, Inc.*, 89 F.3d at 674, 680 (holding patent license specifying it was "non-transferrable" was "not assumable and assignable in bankruptcy").

### B. California Law Applies

The United States Supreme Court "has held that a litigant who is not a party to an arbitration agreement may invoke arbitration under the FAA if the relevant state contract law allows the litigant to enforce the agreement." *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122, 1128 (9th Cir. 2013) (citing *Arthur Andersen LLP v. Carlisle,* 556 U.S. 624, 632 (2009)). Looking

8

just to this holding, California law would normally apply here to determine whether Aqua, a nonsignatory and alleged assignee, may invoke the arbitration provision.

But the Ninth Circuit has held that "federal law governs the assignability of patent licenses because of the conflict between federal patent policy and state laws, such as California's, that would allow assignability." *In re CFLC, Inc.*, 89 F.3d at 679.[5] The court explained that:

> The fundamental policy of the patent system is to "encourag[e] the creation and disclosure of new, useful, and non-obvious advances in technology and design" by granting the inventor the reward of "the exclusive right to practice the invention for a period of years". Allowing free assignability—or, more accurately, allowing states to allow free assignability—of nonexclusive patent licenses would undermine the reward that encourages invention . . . . In essence, every licensee would become a potential competitor with the licensor-patent holder in the market for licenses under the patents . . . Thus, any license a patent holder granted—even to the smallest firm in the product market most remote from its own—would be fraught with the danger that the licensee would assign it to the patent holder's most serious competitor, a party whom the patent holder itself might be absolutely unwilling to license.

*Id.* (internal citations omitted). In line with the underlying rationale, the court framed the rule in terms of limiting attempted assignments by licensees to protect the interests of licensors. *See id.* at 680 ("[F]ederal law governs the assignability of nonexclusive patent licenses, and . . . makes such licenses personal and assignable only with the consent of the licensor[.]").

Here Aqua is acting as a licensor of the patent license, as was EAC and Ozone before it. Levi is the licensee. I am not aware of any decision that applies the federal rule to limit a licensor's—rather than a licensee's—ability to assign, as Levi advocates here. Levi cites *Eastman Kodak Co. v. Cetus Corp.*, No. CIV. A. 12,249, 1991 WL 255936, at *1 (Del. Ch. Dec. 3, 1991). There, the parties entered into a patent license agreement that included a non-assignment provision and the licensor attempted to sell its rights in the patented technology to the licensee's

---

[5] California state courts have rejected the Ninth Circuit's preemption argument and continue to apply state law to evaluate the assignability of patent licenses. *See, e.g., Superbrace, Inc.*, 124 Cal. App. 4th at 401 (after discussing several scholarly articles criticizing the *In re CFLC, Inc.* decision, the California Court of Appeal "[chose] to stand steadfastly by [the California] Supreme Court's 1957 ruling . . . that state law, not federal common law, is to be applied when determining whether a patent license is assignable.").

9

competitor. *Id.* *1-2. The parties decided to arbitrate the issue of assignability and the licensee sought a preliminary injunction to prevent the assignment or transfer of assets, pending resolution of the arbitration. *Id.* at *1, 3. In finding that the licensee had established a likelihood of success on the merits, the court stated, "The non-assignability provision could plausibly be read to include the rights [licensor] retained as well as those rights granted to either party under the Agreement. Thus, it would be necessary to ascertain the parties' intent in order to resolve this issue. *Cf. PPG Industries, Inc. v. Guardian Industries Corp.*, 597 F.2d 1090 (6th Cir. 1979)." *Id.* at *5. I am not persuaded that *Eastman Kodak*'s reference to *PPG Industries*, which applied the federal rule to licensees, justifies application of the federal rule to licensors.

Levi also argues that "[w]ere the licensor to transfer the patent license to the licensee's most serious competitor, that competitor could gain confidential information from the licensee regarding sales figures, costs and pricing, supply chain, and the like, or even terminate the license." Oppo. at 13. But applying the federal rule to licensors does not serve the rule's purpose: encouraging invention. Moreover, where a license agreement is non-exclusive – as the License Agreement here is – there is nothing that would prevent a licensor from providing a license to an existing licensee's competitors. *See* License Agreement § 3.3.1.

For these reasons, I decline to extend the federal rule to licensors. California state law governs the issue of whether Aqua has standing to invoke the arbitration provision of the License Agreement.

## II.  STANDING TO ENFORCE

As stated above, under California law, "[g]eneral contract and agency principles apply in determining the enforcement of an arbitration agreement by or against nonsignatories. Among these principles are 1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel." *Mundi*, 555 F.3d at 1045 (internal quotation marks and citation omitted). EAC assigned its interest in the License Agreement to Ozone and Aqua argues that Levi, by its course of conduct, agreed to that assignment. Aqua then asserts that, as Ozone's sole shareholder, it assumed the interest in the License Agreement after Ozone dissolved and has standing to enforce the arbitration provision through:  (1) assumption as a corporate successor; (2) equitable

10

estoppel; (3) incorporation by reference; and (4) agency.  Levi disagrees, arguing that neither Ozone nor Aqua is a signatory to the License Agreement and prior consent was not sought from it for any transfers.

### A. Transfer from EAC to Ozone

Aqua contends that EAC assigned its interest in the License Agreement to Ozone, that EAC and Ozone adequately notified Levi of this assignment, and that Levi's subsequent course of conduct waived any objection by Levi based upon the pre-assignment consent provision in the License Agreement.  Mot. at 10, 12.  Levi objects to this characterization, primarily because Levi was not notified there were interim transfers from EAC to Wasinger and then from Wasinger to Ozone.  It argues that because it could have potentially suffered prejudice from the interim or subsequent assignments, it cannot be considered to have waived its objection or otherwise ratified the assignments.  Oppo. at 11.

An assignment made without contractually-required prior consent is "not void, but voidable."  *Buchanan v. Banta*, 204 Cal. 73, 76 (1928).  The party whose consent was required must exercise its option to void the contract.  *Id.* at 76-77.  A party may waive its right to enforce a contract provision through its course of conduct.  *See Chanan Singh v. Cross*, 60 Cal. App. 309, 317 (Cal. Ct. App. 1922) (waiver of a provision for written notice "may be shown by circumstances or a course of acts or conduct").  For waiver to occur, there must be an "intentional relinquishment of a known right after knowledge of the facts."  *Roesch v. De Mota*, 24 Cal.2d 563, 572 (1944) (finding no waiver of defense of usury because "the availability of such a defense was not then within their knowledge").

Levi contends that it could not have waived any objection to the assignment of rights because "there is no evidence that [Levi] had any knowledge of the transfers from EAC to Wasinger or from Wasinger to Ozone."  Oppo. at 13.  But Levi did receive notice that Ozone asserted that it acquired EAC's rights under the License Agreement.  On September 14, 1998, the President of Ozone and the President of EAC co-signed and sent a letter to Levi "to notify Levi of the need to assign the rights to the [License Agreement] between [Levi] and [EAC] to [Ozone]."  Long Decl., Ex. J.  The letter stated:

11

> [Ozone] acquired the rights to the [Wasinger Agreement] that is referenced in the [License Agreement]. Therefore, [Ozone] is the rightful owner of the exclusive rights to the processes developed and made a part of the [License Agreement] between [Levi] and [EAC]. The [License Agreement] should be modified to now include [Ozone] as the proper party. [Ozone] shall assume the full rights of the [License Agreement] between [Levi] and [EAC].

*Id.* Further, in June 2000, Levi sent to James Stackhouse, the former Vice President of Ozone, two quarterly reports regarding Levi's and its subcontractor's usage of the patented processes. Long Decl., Ex. K at 8. Sending these quarterly reports demonstrates that Levi used the patented processes (its right under the License Agreement) and fulfilled at least some of its obligations after receiving notice of Ozone's assumption. *See* License Agreement § 4.4 (requiring Levi to certify a statement of "the number of Licensed Products Received, and the amount of royalty shown to be due" for each quarter). Levi, therefore, continued to act pursuant to the License Agreement, despite knowing that Ozone asserted it was the licensor.

   Levi also argues that it objected to the assignment to Ozone. Oppo. at 14. On January 16, 2001, Levi sent a letter to Ozone's attorney, William H. Shackelford, Jr., stating, "[EAC]'s assignment of the agreement was apparently made without the written consent of [Levi], and accordingly constitutes a technical breach of Article 16.2 of the [License] Agreement." Long Decl., Ex. K at 10. Under License Agreement § 10.2, if there is a breach, the non-breaching party "shall have the right (but not the obligation) to terminate" the agreement, "effective immediately upon written notice to the other party." Although the January 16, 2001 letter did note a "technical breach," it did not put Ozone on notice that it would terminate the agreement if the breach was not cured. Instead, the letter simply requested "a copy of the documentation establishing the chain of title from [EAC], to [Aqua] (or [Ozone], or whoever claims to now be the Licensor)." Long Decl., Ex. K at 10. Moreover, the identification of the "technical breach" was in the context of the parties' attempt to resolve a dispute over a Levi contractor using the patented ozone process and Levi's suggested "modification" of the License Agreement and the need to "correct" the parties to that agreement (presumably to reflect Ozone as the ongoing licensor). In any event, the letter establishes that Levi knew of the technical breach but does not show that Levi *objected* to the assignment.

Overall, the correspondence between Levi and Ozone demonstrates that Levi had knowledge of Ozone's position and of its contractual right to object to the assignment to Ozone. Levi, however, did not object to the assignment nor did it move to terminate the License Agreement. Instead of objecting, Levi continued to act pursuant to the contract. By its course of conduct, Levi waived its right to object to the assignment to Ozone.[6]

### C. Transfer from Ozone to Aqua

Aqua argues that it has standing to enforce the arbitration agreement through its assumption of Ozone's interests in the License Agreement under four theories: (i) successor-in-interest; (ii) equitable estoppel; (iii) incorporation by reference; and (iv) agency. There is no reason to address the last three arguments raised by Aqua because the first one entitles it to compel arbitration.

"Nonsignatory successors and alleged alter egos are entitled to compel arbitration under clauses signed by the corporations whose liabilities they are alleged to have assumed." *Prograph Int'l Inc. v. Barhydt*, 928 F. Supp. 983, 991 (N.D. Cal. 1996). At the time of its administrative dissolution, all of Ozone's assets, including its rights in the License Agreement, were transferred to Aqua as Ozone's sole shareholder. Long Decl. ¶¶ 14-15. Aqua argues that it is therefore Ozone's successor in interest. Levi responds that any purported "transfer" of Ozone's rights under the License Agreement to Aqua is "invalid" without Levi's consent, regardless of whether the "dissolution" of Ozone (under Tennessee law) and the transfer of rights under the License Agreement occurred by operation of law, similar to a merger, or by agreement of Ozone and Aqua.

Levi's argument fails for several reasons. The case law on which Levi relies is inapposite because it deals with the transfer of the "personal" license rights of a patent licensee, not with transfer of rights under a License Agreement to a new licensor. Consider *Board of Regents of*

---

[6] Levi argues that the chain of title is "further clouded" by the claim made by Fiberzone that it was "the current owner and licensor" under the License Agreement in 2005, the time period during which Ozone purportedly was the licensor. Oppo. at 6-8; *see also* McFarlane Decl., Ex. B. This does not undermine the finding that Levi's course of conduct with Ozone waived its right to object to Ozone as an assignee.

1  *University of Nebraska v. BASF Corp.*, where the court recognized that, "Federal law has
2  established a clear rule that patent licenses are not assignable without express permission by the
3  licensor. This rule permits both a patent licensor and its licensee to know precisely how that
4  license may be used in the future." No. 04-cv-3356, 2007 WL 3342406, at *15 (D. Neb. Nov. 6,
5  2007). That discussion shows, again, that the interest being protected is the licensor's. In this
6  case, the licensor (Aqua, and Ozone and EAC before it) was free to issue as many licenses as it
7  desired without Levi's consent because of the non-exclusive nature of Levi's license rights under
8  the License Agreement. Similarly, *Aoki v. Gilbert*, No. 11-cv-02797, 2013 WL 1156495 (E.D.
9  Cal. Mar. 19, 2013) is distinguishable because it dealt with purported sub-licensee defendants.
10 Although the defendants referred to themselves as "successors in interest," they argued that they
11 were covered by the patent license agreement only because of various assignments from prior
12 licensees that were ineffective in light of the agreement's written consent (from the licensor)
13 requirement. *Id*. at *8.
14       Pointing out that the federal rule prohibiting transferability of license rights by a patent
15 licensee (absent express permission) likewise applies in the copyright context to software licenses
16 does not assist Levi in its argument against Aqua, the purported licensor. *See, e.g., SQL Sols., Inc.
17 v. Oracle Corp.*, No. C-91-1079 MHP, 1991 WL 626458, at *6 (N.D. Cal. Dec. 18, 1991) (where
18 copyright licensee company was reorganized into another company, transfer of rights occurred by
19 law but because copyright license was personal and not transferable, "the court finds that an
20 illegitimate transfer of copyright license rights occurred when D & N became SQL, and that
21 Oracle was legally entitled to termination of the Agreement."); *see also Cincom Sys., Inc. v.
22 Novelis Corp.*, 581 F.3d 431 (6th Cir. 2009) (merger of corporate subsidiary and software licensee
23 into another subsidiary resulted in a transfer of software license to the surviving corporate entity,
24 the alleged infringer, in violation of license agreement providing that licensee could not transfer
25 rights without prior written approval). The federal rule does not apply here and cannot provide
26 Levi shelter from the arbitration agreement.
27       Moreover, License Agreement § 16.2 requires consent to "assignments." It also states,
28 "Subject to such restrictions [on assignment], this Agreement shall be binding upon and inure to

the benefit of the parties, their successors and assigns." License Agreement § 16.2. The License Agreement does not expressly require consent of parties to the passing of rights under the License Agreement to a successor licensor. As the very cases on which Levi relies demonstrate, when Ozone dissolved, its sole shareholder (Aqua) was not "assigned" rights under the License Agreement. Instead, those rights were transferred and "assumed" by Aqua as a matter of law. *See* Long Decl., Ex. L (Memorandum for Record, recording "transfer" of the patents and rights under License Agreement from Ozone to Aqua); *see also PPG Industries*, 597 F.2d at 1096 (finding that a transfer by operation of law takes place during a merger); *Bd. of Regents of Univ. of Nebraska*, 2007 WL 3342406, at *15 (adopting *PPG Industries*); *SQL Solutions*, 1991 WL 626458, at *4 (agreeing with decisions that "held that a transfer of rights is no less a transfer because it occurs by operation of law in a merger"); *In re Gonzalez*, 456 B.R. 429, 435 (Bankr. C.D. Cal. 2011), *rev'd on other grounds*, No. 11-BK-15665, 2012 WL 8262445 (C.D. Cal. June 14, 2012) ("Another example [of a transfer by operation of law] is a merger of corporations under California law, where the surviving corporation succeeds to all of the disappearing corporation's property 'without other transfer.'").[7] Aqua is entitled to enforce the arbitration provision because it is a successor in interest under the License Agreement.

California law is in agreement. *See Trubowitch v. Riverbank Canning Co.*, 30 Cal. 2d 335, 344-45 (1947) ("[I]f an assignment results merely from a change in the legal form of ownership of a business, its validity depends upon whether it affects the interests of the parties protected by the nonassignability of the contract."). While Levi asserts that it "may have" objected to the

---

[7] Ozone was a Tennessee corporation before it was administratively dissolved. Levi argues that, under Tennessee law, an administrative dissolution is different than a merger. In a merger, "all the assets and liabilities of the target company are transferred to the acquiring company." Oppo. at 15. Because an administratively dissolved corporation's assets are subject to claims by creditors, Levi asserts that the only way Ozone's rights could have transferred to Aqua was through an assignment. *Id.* This argument holds no weight. Upon its dissolution, Ozone's assets transferred to Aqua "subject to any and all liabilities," which is similar to a merger. Long Decl., Ex. L. Moreover, when an administratively dissolved corporation wishes to terminate its corporate existence, it must file articles of termination setting forth "[t]hat all the assets of the corporation have been distributed to its creditors and shareholders." Tenn. Code Ann. § 48-24-205(a)(5). Any of Ozone's assets that did not go to creditors must have been transferred to its sole shareholder, Aqua. Levi has not demonstrated that Aqua acquired Ozone's rights in the License Agreement through an assignment, rather than a transfer by operation of law as Ozone's successor in interest.

assignment from EAC to Ozone because it had concerns about Ozone's ability to protect the patents, defend Levi from claims of patent infringement, and enforce the patents, Levi has not identified any prejudice that it *actually* faced or *actually* suffered as a result of the transfer of rights from Ozone to Aqua.

## CONCLUSION

California law governs whether Aqua, as a non-signatory, has standing to invoke the arbitration provision of the License Agreement. As noted in my prior Order, I have not determined whether Aqua waived its right to seek arbitration; that issue is for the arbitrator to decide. I hold that Levi waived its right to object to the assignment to Ozone through its course of conduct and that Aqua is a successor-in-interest to Ozone under the License Agreement. It is entitled to enforce the arbitration provision. Aqua's Motion to Compel Arbitration is GRANTED.

**IT IS SO ORDERED**.

Dated: October 18, 2016



WILLIAM H. ORRICK
United States District Judge